UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

DARRYL ADAMS,                                    :

                                 Petitioner,     :

        - against -                              :

UNITED STATES OF AMERICA,                        :

                                 Respondent.     :

----------------------------------------------------------x

| USDC SDNY_____ |
| DOCUMENT_____ |
| ELECTRONICALLY |
| FILED ____3/4/13_____ |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JED S. RAKOFF_____**

06 Cr. 218 (JSR)
09 Civ. 9275 (JSR) (FM)

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

        Petitioner Darryl Adams ("Adams") brings this pro se proceeding pursuant to 28 U.S.C. § 2255 ("Section 2255") to challenge his conviction on all three counts of an indictment charging him with: (a) conspiring to distribute and possess with intent to distribute five grams or more of crack cocaine (Count One); (b) distributing and possessing with intent to distribute an unspecified quantity of powder cocaine (Count Two); and (c) distributing and possessing with intent to distribute five grams or more of crack cocaine (Count Three). (See Cr. ECF No. 62).[1] On January 22, 2007, Your Honor sentenced Adams to concurrent terms of 168 months imprisonment on each count, to be followed by five years of supervised release. (Id.; S. 75).

----

[1]     "Cr. ECF No." refers to docket entries in 06 Cr. 218. "Civ. ECF No." refers to docket entries in 09 Civ. 9275, the related civil proceeding. "Tr." refers to Cr. ECF No. 55. "S." refers to Cr. ECF No. 68.

In his motion (Civ. ECF No. 1 ("Petition" or "Pet.")), Adams asserts several claims.  Specifically, Adams contends that he was denied the effective assistance of counsel during his trial, at sentencing, and on appeal, in violation of the Sixth Amendment.  (Pet. at 5, 5a, 5b, 5c, 7-8, 8a, 9).  Adams further maintains that his Fifth and Sixth Amendment rights were violated because the prosecutor engaged in misconduct and because the instructions given to the jury were constitutionally deficient.  (Id. at 6, 6a, 10).

For the reasons that follow, I recommend that the Petition be denied.  Additionally, because Adams has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

II.     Factual Background

A.     Trial

1.     Government's Case[2]

At trial, the Government presented the testimony of only two witnesses: Drug Enforcement Administration ("DEA") Special Agent Toby Byrd ("Byrd"), and Steve Garcia, a DEA Confidential Source ("Garcia") ("CS").  Their testimony and the

---

[2]     Many of the cases and other materials cited in this Report and Recommendation disagree as to whether the term "Government" should be capitalized.  For the sake of consistency, I have used the capitalized version of the word and have revised certain quotations to conform to that usage without indicating that the text has been edited.

other evidence presented at trial would have enabled a reasonable juror to conclude as follows:

Garcia is a CS who works for the DEA in exchange for monetary compensation.  (Id. at 31-32, 173-75).  In October 2005, while reporting to Byrd, Garcia assisted in an investigation of violent narcotics traffickers in the vicinity of the Patterson housing project in the South Bronx.  (Id. at 29-30, 32, 176).  On October 25, 2005, Garcia purchased one ounce of powder cocaine from Adams at 145th Street and Willis Avenue in the Bronx.  (Tr. 168-69).  The following night, Garcia purchased two ounces of crack cocaine from Adams at 149th Street and Morris Avenue in the Bronx.  (Id. at 168-70).  During both transactions, Garcia wore a recording device.  (Id. at 184, 188-89).

Garcia had grown up in the same apartment building as Darrin Carathers ("Carathers"), who used and sold drugs in high school.  (Id. at 176-77).  Carathers continued selling drugs in the 1990s.  (Id. at 321-23, 326-27).  In or around October 2005, Garcia approached Carathers on a street corner and asked whether he knew anyone who had "some hard," i.e., crack cocaine.  (Id. at 176, 178-80).  Garcia indicated that he wanted to purchase the crack so that he could "flip" it in order to make money.  (Id. at 182).  Carathers, who is wheelchair-bound, responded by telephoning Adams on Garcia's behalf.  (Id. at 180).

At Byrd's instruction, Garcia subsequently called Carathers to arrange to purchase crack from Adams.  (Id. at 181).  During that call, Garcia and Carathers agreed

that a sale of two ounces of crack for $1,400 would take place on October 25, 2005, at a

laundromat on the corner of 145th Street and Willis Avenue.  (Id. at 181-82).

On the evening of October 25, after Garcia drove to the location, Carathers

and a friend, Ronald Pleasant ("Pleasant"), arrived.  (Id. at 42, 185, 188-90).  Soon

thereafter, Adams and another person drove into the parking lot in a white Toyota Camry.

After Adams stepped out of the vehicle, Carathers introduced Garcia to Adams.  (Id. at

44, 200-01, 224).  Garcia soon learned that, rather than bringing crack cocaine, Adams

had brought only powder cocaine.  (Id. at 45, 201).  Adams instructed Garcia that, if he

wanted crack cocaine, in the future he should refer to it as "ready made," instead of

"hard," so that there would be no confusion.  (Id.).

As the discussion progressed, Garcia agreed to purchase some powder

cocaine.  (Id. at 46-47, 205).  Adams told Garcia that the price per ounce was $785, or

"28 a gram," but Garcia indicated that he thought the price would be $700 per ounce and,

therefore, had brought only $1,400.  (Tr. 46-47, 206-09, 527-28).  Garcia also stated that

he wanted "two more tomorrow, ready-made."  (Id. at 46, 209).  At that point, Adams

walked to the Toyota to check with his "man."  (Id. at 201, 206-07).

After returning to Garcia's vehicle, Adams handed Garcia a bag containing

approximately one ounce of powder cocaine and suggested that he taste it, commenting

that "there is no shit on the street like this."  (Id. at 201, 208).  Adams also told Garcia

that he could "step on that hard" and that "every grain in this comes back," which Garcia

understood to mean that he could dilute the cocaine and cook it down to make quality

4

crack.  (Id. at 202, 211).  Garcia paid Adams $700 for the ounce of cocaine.  (Id. at 47, 209-10).

Although Adams agreed to sell Garcia two ounces of crack for $1,400 the following night, he also commented that his people usually only sell "bricks," meaning kilograms of cocaine.  (Id. at 47, 210, 213-14).  When Garcia asked Adams how much a kilogram of cocaine cost, Adams told him $24,500.  (Id.).

On October 26, Garcia had a telephone conversation with Adams during which they agreed to meet at 149th Street and Morris Avenue for the second sale.  (Id. at 51, 214, 228).  Garcia did not intend to involve Carathers in this transaction, but Carathers was at the buy location when he got there.  (Id. at 51, 222-24).  When Adams arrived, he entered Garcia's vehicle and handed him two ounces of crack in exchange for $1,400.  (Id. at 51, 226-28).

Several months later, in early February 2006, the DEA arrested Adams, Carathers, and Pleasant.[3]  (Id. at 30-31, 54).

2.    Defense Case

In light of the audio recordings and surveillance of the two drug deals, Adams could not credibly contend that the transactions had not occurred or that he was not a participant.  Instead, he admitted his role, but, together with Carathers, relied on an

---

[3]    Pleasant subsequently pleaded guilty to charges contained in a superseding information.  (See Cr. ECF Nos. 17, 18, 57).  Carathers proceeded to trial with Adams and was convicted on Count Two, but not on Counts One and Three, in which he also was named.  (See Cr. ECF No. 63).

5

entrapment defense.  Their theory was that Garcia had begged Carathers – who was virtually a member of the Garcia family – to introduce him to a cocaine dealer because he allegedly was in danger as a result of a failed drug deal and could only repay his dealer through the proceeds of further drug transactions.  Although Adams did not know Garcia, he allegedly became involved as an accommodation to Carathers because he knew a drug dealer, and therefore could serve as a middle-man between that dealer and Garcia.  Like Carathers, Adams maintained that he was not predisposed to sell cocaine or crack and would not have done so without Garcia's inducement.

In support of this theory, the defendants called three witnesses:  Steve Garcia's brother Raul; Carathers; and Adams himself.

### a.     Raul Garcia's Testimony

The purpose of Raul Garcia's testimony was two-fold:  first, to undermine the CS's credibility; second, to establish that the Garcia family had taken care of Carathers throughout his life, that Carathers therefore felt uniquely indebted to the Garcias, and that Adams had acted to help Garcia, whom Carathers described as his cousin, after being told that Garcia's life was in danger.

Consistent with this theory, Raul Garcia testified that Carathers was very close to his family and that they had treated him "like a brother."  (Id. at 349-50, 354). Raul further testified that he, his brother, and some neighborhood friends visited Carathers at the Green Haven Correctional Facility in 2001.  (Id. at 352).  Raul identified photographs of their visit, noting that his brother and Carathers "always took care of each

other." (Id. at 352-53). Raul also explained that he did not know that his brother was a

CS until after it became public record. Indeed, according to Raul, Garcia had lied to him,

falsely claiming to have spent time in jail. (Id. at 354).

> b.    Carathers' Testimony

Carathers testified that he had known Steve Garcia for more than twenty

years, and that the Garcias were "like family" to him. (Id. at 377-78, 387). He admitted

to having sold drugs in the past, but testified that he never sold any quantity greater than

five-dollar bags. (Id. at 378-83). He further claimed that he had not sold any drugs from

1998 to 2005.[4] (Id. at 384).

According to Carathers, in September 2005, Garcia approached him and

stated that he needed to buy "ounces" of cocaine in order to generate cash because he had

"messed up some money or something like that." (Id. at 388, 435). Carathers told Garcia

that he didn't know anyone who sold cocaine in such large quantities, but agreed to try to

find a seller after learning that Garcia's "life was in danger." (Id. at 388-89).

A week or two later, Carathers encountered Adams, a friend of his who was

staying at the same homeless shelter. Carathers told Adams that his "cousin"[5] was in

trouble and needed to buy cocaine. (Id. at 390). Adams allegedly explained that he did

not know anyone who could supply cocaine, but would look into it. (Id. at 390-91). Soon

---

[4]    As the prosecution established, Carathers was in jail for much of this time. (Id. at 427-32).

[5]    Garcia and Carathers are not cousins. (See id. at 350, 390).

thereafter, Adams also gave Carathers permission to give Garcia his phone number so that Garcia and Adams could speak directly.  (Id. at 391, 495).

Carathers testified that he was with Pleasant in Manhattan on October 25, when Garcia called and directed him to come to the Bronx because he was planning to buy cocaine from Adams.  (Id. at 393-94).  Carathers further claimed that he was angry when he and Pleasant arrived at the laundromat because his presence was unnecessary since he had provided Garcia with Adams' phone number.  (Id. at 395-97).  Nevertheless, once Adams arrived, Carathers made the necessary introductions, assuring both Adams and Garcia that they could trust each other.  (Id. at 403).  Carathers conceded that he then asked Garcia whether he had told Adams that he wanted "hard," because Carathers had previously provided that information to Adams.  (Id. at 400).  According to Carathers, he had not previously heard the phrase "ready made."  (Id. at 401).  Subsequently, after the sale was completed, Carathers felt disrespected when Garcia gave him only twenty dollars for his efforts.  (Id. at 406, 414).

Carathers testified further that he did not learn of the October 26 deal until he ran into Garcia near a bus stop, at which time he complained about Garcia's decision to give him only twenty dollars the day before.  (Id. at 412, 414).

c.    Adams' Testimony

During his testimony, Adams largely agreed with Carathers' explanation of the events leading up to October 25 and 26, 2005, but provided additional details

8

concerning his own involvement in the drug deals with Garcia, whom he never had met before October 25.  (Id. at 490).

Adams testified that he was forty-two years old, married, had six children, and worked as a leather crafter.  (Id. at 486-87).  He and Carathers lived in the same apartment complex growing up, and had always been "very friendly."  (Id. at 489-90).  Adams ran into Carathers at a men's shelter on Ward's Island while Adams was staying there during a battle with depression.  (Id. at 491).  At some point, Carathers told him about "a dire situation" concerning his "cousin," who "owed . . . tens of thousands of dollars . . . and . . . was going to be murdered possibly."  (Id. at 493).  Carathers told Adams that Garcia was seeking to purchase drugs to enable him to repay his debt, and asked whether Adams knew any cocaine suppliers.  Adams responded that he did not, but agreed to try to find someone.  (Id. at 493).

Soon thereafter, Garcia called Adams directly.  (Id. at 495).  According to Adams, Garcia identified himself as Carathers' cousin and explained that he had passed out while doing drugs and had been robbed.  Garcia said that he owed around $18,000 in cash, plus two kilos of cocaine he had received on credit.  Garcia further stated that he was so concerned about his safety that he moved from New Jersey to the Bronx.  (Id. at 496-97).

Adams testified that he had no prior involvement with drugs, but nevertheless decided to help Garcia by contacting a childhood family friend whom he believed sold drugs.  (Id. at 490-91, 494, 508, 522).  After he told the supplier that a

9

"close friend['s]" cousin was "in debt for a large sum of money" and needed to buy drugs "in an attempt to try to repay these people," the supplier eventually agreed to sell Garcia drugs.  (Id. at 494, 497).  Nevertheless, because the supplier felt uncomfortable dealing with Garcia directly, he insisted that Adams serve as the middle-man.[6]  (Id. at 497-98).

Adams explained that the confusion regarding the form of cocaine occurred because Adams thought that Garcia had requested powder cocaine and conveyed that request to the supplier.  (Id. at 498-99).  Adams testified that he quoted Garcia a firm price of $785 per ounce for the cocaine before they met.  (Id. at 499-500).  When he learned that Garcia wanted crack rather than powder, and that Garcia had only $700, he returned to the Toyota Camry to talk to his supplier.  (Id. at 499-500).  The supplier stated that he had gone out of his way to help Garcia, who could at least buy the drugs that were there.  (Id.).  Although the supplier did not want to sell the cocaine for only $700, he agreed that he would, but asked Adams to try to obtain at least $725 from Garcia.  (Id.).

Adams contended that he was able to have a detailed discussion with Garcia concerning the quality of the cocaine because the supplier had assured him of its high quality.  According to Adams, Garcia explained that he "needed the best hard drugs possible so that he could dilute it to expand the amounts for resale," make a quick profit, and return the money he owed.  (Id. at 498-99).  Adams further contended that, before October 25, he never had participated in a sale of any controlled substance.  (Id. at 491).

---

[6]     On cross-examination, Adams was asked the supplier's name, but declined to respond, stating that it might put his family in danger.  (Id. at 495).

Finally, Adams testified that after the first sale, he never intended to continue serving as the broker between Garcia and the supplier.  (Id. at 501).  He admitted, however, that he had received fifty dollars from the supplier for setting up the deal on the first night.  (Id.).  He further admitted to consummating the second sale.  (Id. at 490).

B.     Verdict and Sentencing

On July 28, 2006, after a five day trial, the jury convicted Adams on all three counts of the indictment.[7]  (See id. at 671-74).  Thereafter, on January 22, 2007, Your Honor sentenced Adams to concurrent prison terms of 168 months, to be followed by five years of supervised release.  (S. 75, 77).  Your Honor subsequently granted Adams' motion pursuant to 18 U.S.C. § 3582(c)(2) and reduced Adams' sentence from 168 months to 135 months.  (Cr. ECF No. 83).

When he was afforded an opportunity to address the Court prior to his initial sentencing, Adams maintained that there were "plenty of issues" at trial and in preparation for sentencing as to which he had "disagreed bitterly" with his defense counsel.  (Id. at 66).  With respect to the trial, Adams complained that his counsel did not introduce into evidence Adams' cell phone, which contained an entry relating to "Steve, [Bourne's] cousin."  (Id. at 70).  Adams further contended that certain records of the homeless shelter where he was living and a hospital should have been introduced to establish his indigence and that he had been hospitalized until shortly before the drug

---

[7]     A prior trial, held from July 10 through July 18, 2006, resulted in a hung jury with respect to all of the charges against Adams.  (See Cr. ECF No. 56 at 716).

sales.  (Id. at 71).  Adams also suggested that the criminal complaint in which he was named should have been used to impeach Byrd, who had sworn therein that Carathers was a known crack distributor in the vicinity of the Patterson housing project, (Cr. ECF No. 1, ¶ 8), yet testified at trial that he knew Carathers to have been involved in selling untaxed cigarettes and CDs and DVDs, but not drugs.  (Tr. 71-72).  Adams also cited as an area of disagreement a proposed motion for a new trial, which evidently had been submitted pro se after Adams' counsel declined to file it.  Although not reflected on the docket sheet, it appears that Your Honor denied that motion.  (Id. at 67).

      C.      Subsequent Procedural History

          1.     Direct Appeal

On appeal, Adams argued that (a) the Government failed to establish his predisposition to commit a crime, as it was required to do in order to overcome his entrapment defense; (b) Your Honor erred in the course of providing supplemental instructions concerning entrapment and the burden of proof in response to oral questions from the jurors; and (c) Your Honor further erred by denying Adams' motion for new court-appointed counsel prior to sentencing.  (Pet. at 3).  On May 30, 2008, the Court of Appeals affirmed Adams' conviction in a summary order.  United States v. Carathers, 280 Fed. Appx. 72, 76 (2d Cir. 2008).

In that decision, the Court first observed that "reasonable jurors could have found that Adams was predisposed to commit the crimes for which he was convicted" based, "in part, on tape-recorded conversations in which Adams evinced a keen

understanding of the narcotics trade and referred to '[his] people' selling 'bricks,' i.e., kilograms, of cocaine." Id. at 74.

The Court further held that Adams "fail[ed] to demonstrate any prejudice resulting from the substance of the court's supplemental instructions," id. at 75, and that it was not an abuse of discretion to decline to appoint new counsel before Adams was sentenced. Id. at 76.

2.   Habeas Petition and Subsequent Collateral Challenges

There is considerable confusion as to when Adams' Petition was filed. The Petition itself is dated August 20, 2009, and purports to have been mailed the following day by another inmate because Adams had been "transferred to a Federal Medical Facility." (Civ. ECF No. 1 at 13). Despite this representation by the other inmate, the Petition was not docketed until November 9, 2009. To add to the confusion, the first page of the Petition indicates that it was received by the Pro Se Office of this Court on August 31, 2010. (Id. at 1). Adams himself also wrote to the Court on August 25, 2009, to request an extension of the one-year deadline to file his Petition, claiming that he was unable to obtain his legal paperwork after he was transferred between federal facilities in July 2009. (See Cr. ECF No. 71).

Based on these facts, the Government urges the Court to find that the Petition is untimely. (See Civ. ECF No. 6 at 8-10). Although it appears that the Government may be correct, resolving the timeliness issue could conceivably require an evidentiary hearing. As set forth below, it is clear that even if Adams' Petition is timely,

13

it is meritless.  For this reason, I will assume that the Petition was timely filed and turn to the merits of Adams' claims.

III.    Discussion

    A.    Standard of Review

The first sentence of Section 2255 provides that

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  Relief under that statute consequently may be based only on "constitutional error . . . or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Among the reasons for circumscribing relief in this manner are "a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place."  Id.

Section 2255 is "not a substitute for [a direct] appeal."  Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1998) (quoting United States v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998)); Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam). Claims that could have been raised on direct appeal, but were not, therefore generally are unreviewable under Section 2255, unless the defendant can demonstrate either "cause for failing to raise the issue, and prejudice resulting therefrom" or "actual innocence."  Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005) (quoting Rosario, 164 F.3d at 732).

One exception to this procedural bar relates to ineffective assistance of counsel claims, which need not be incorporated into a criminal defendant's direct appeal. Massaro v. United States, 538 U.S. 500, 508-09 (2003).  As the Supreme Court has explained, because the trial judge is in the best position to assess the merits of an ineffective assistance claim, "a motion brought under [Section 2255] is preferable to [a] direct appeal for deciding [such] claims."  Id. at 504.

B.    Ineffective Assistance of Counsel

In order to prevail on his ineffective assistance of counsel claims, Adams must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688-94 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Therefore, Adams "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  Moreover, a court considering an ineffectiveness claim need not "address both components of the [Strickland] inquiry if the [petitioner] makes an insufficient showing on one."  Strickland, 466 U.S. at 697.

The Second Circuit has recognized that "[a] defendant seeking a hearing on an ineffective assistance of counsel claim 'need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim.'" Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)).  Nevertheless, the petitioner's "application must contain assertions of fact that a petitioner is in a position to establish by competent evidence."  United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987).  "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing."  Id. at 113-14.

In his Petition, Adams claims that his trial and appellate counsel provided constitutionally deficient representation in numerous ways.  None of these assignments of error withstands scrutiny.

1.     Failure to Introduce Expert Opinion Testimony

Adams first alleges that his counsel failed to investigate and introduce evidence concerning the mental health treatment that he was receiving at the time of the October 2005 narcotics transactions.  (Pet. at 5-5a).  Adams theorizes that a psychiatrist could have testified about Adams' "severe depression" and stress, thereby corroborating his lack of predisposition to commit the crime.  (Id.; Cr. ECF No. 84 ("Reply") at 11).

To be sure, the constitutional guarantee of effective assistance of counsel is not limited to the trial itself.  Consequently, a defendant is entitled to be represented by an attorney who has made either "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary."  Greiner v. Wells, 417 F.3d 305, 320-21

16

(2d Cir. 2005) (citing <u>Strickland</u>, 466 U.S. at 691).  The duty to investigate, however,

"does not . . . compel defense counsel to investigate comprehensively every lead or

possible defense."  <u>Id.</u> at 321 (citing <u>Strickland</u>, 466 U.S. at 699, and <u>United States v.</u>

<u>Cruz</u>, 785 F.2d 399, 406 (2d Cir. 1986)).  Accordingly, "[w]hen there is 'reason to believe

that pursuing certain investigations would be fruitless . . . , counsel's failure to pursue

those investigations may not later be challenged as unreasonable."  <u>Id.</u> (quoting

<u>Strickland</u>, 466 U.S. at 691).  Moreover, "'strategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable,'

and even strategic choices made after less than complete investigation do not amount to

ineffective assistance – so long as the known facts made it reasonable to believe that

further investigation was unnecessary."  <u>Henry v. Poole</u>, 409 F.3d 48, 63 (2d Cir. 2005)

(quoting <u>Strickland</u>, 466 U.S. at 690-91).

   Here, although Adams suggests that a psychiatrist should have been

consulted, he has not shown that his trial counsel failed to consider that strategy.

Furthermore, the fact that Adams allegedly was depressed and under stress does not mean

that he necessarily lacked the predisposition to engage in drug sales.  Adams' trial

counsel therefore reasonably could have concluded that the testimony of a psychiatrist

would not have been relevant or helpful to the defense.  Indeed, unless Adams' mental

state was so compromised that he lacked the mental capacity to commit the crimes

charged, it seems likely that the testimony of a psychiatrist concerning Adams'

depression and stress would have been subject to exclusion on relevance grounds.  <u>See</u>

Fed. R. Evid. 402.

17

Adams, of course, has not shown that there is a psychiatrist who could have offered admissible testimony relevant to his entrapment defense.  However, even if the Court were to assume that such a witness existed, Adams still would have to establish a reasonable probability that the psychiatrist's testimony would have resulted in a different outcome at trial.  Adams clearly cannot do so in this case since the evidence of his willingness to engage in a drug sale was overwhelming.  Indeed, as the Second Circuit observed, during his tape-recorded dealings with Garcia, Adams demonstrated considerable knowledge of the procedures and lingo of narcotics transactions.  Accordingly, even if there had been psychiatric evidence that he was depressed and under stress, there is no reason to believe that a jury necessarily would have concluded that a forty-two year-old father of six, who allegedly had no prior involvement with drugs, risked criminal prosecution by participating in <u>two</u> narcotics transactions simply to help someone he did not previously know.  It is instead far more likely that the jury would have concluded that Adams was an experienced drug dealer who was not entrapped.

Adams therefore cannot show that the failure to call a psychiatric expert constituted ineffective assistance.

### 2.   Failure to Review Recordings

Adams next asserts that his counsel should have hired an audio expert to analyze the tape-recorded drug transactions.  (Pet. at 5a.)  He claims that the prosecution "tampered with" this evidence in order "to conform [it] with the Government's case in chief," and that his counsel was ineffective for failing to investigate this issue.  (<u>Id.</u>).

As is true of his claim concerning psychiatric expert testimony, however, Adams has not proffered any <u>facts</u> to support this claim.  At the outset, Adams has not shown that his counsel failed to consider the possibility that the tapes were altered.  In any event, even if counsel summarily rejected Adams' protestations concerning the tapes, to prevail on his claim Adams must show that he suffered prejudice.  Adams' conclusory assertion that the tapes were altered clearly is an insufficient basis for the Court to conclude that they were.  <u>See, e.g.</u>, <u>Jones v. Marshall</u>, No. CV 07-0605-GHK (JTL), 2009 WL 361653, at *13-14 (C.D. Cal. Feb. 9, 2009) (rejecting petitioner's altered tape recording claim because he failed to provide "evidence for his contention," or "set forth what statements were omitted" and how they "would have been helpful to his defense").  Consequently, even if his counsel failed to submit the tapes to an expert for review, Adams has not shown that he suffered any prejudice as a consequence of this omission.

### 3.   Failure to Impeach Garcia

Adams further argues that trial counsel provided ineffective assistance by virtue of his failure adequately to investigate and impeach Garcia, the Government's key witness.  (Pet. at 5a-5c).  As noted previously, the extent to which matters should be investigated is an issue remitted largely to the sound discretion of trial counsel.  <u>See</u> <u>Greiner</u>, 417 F.3d at 320-21.  Similarly, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim."  <u>Dunham v. Travis</u>, 313 F.3d 724, 732 (2d Cir. 2002) (quoting <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987)); <u>see</u> <u>Garcia v. Kuhlmann</u>, 897 F. Supp. 728, 730 (S.D.N.Y. 1995) ("The choice of

how to conduct cross-examination is a matter of trial strategy, which will not be reviewed by the Court unless counsel failed even to put on a defense, or to perform other basic elements of trial advocacy.").  Here, none of the numerous assignments of error that Adams makes with respect to Garcia's testimony even remotely suggests that his counsel's representation failed to meet the requirements of Strickland.

> a.   Garcia's Deactivation from Service

Adams first argues that his counsel failed to investigate and cross-examine Garcia concerning his five-year deactivation from service as a CS.  (Pet. at 5a).  As Adams explains, this hiatus occurred "for reasons unknown, but which could have directly affected [Garcia's] credibility."  (Id.) (emphasis added).  Pretrial discovery in criminal matters, however, is limited.  See Fed. R. Crim. P. 16(a); 18 U.S.C. § 3500.  Accordingly, unless the Government had a duty to disclose the reason for Garcia's inactivity pursuant to Brady v. Maryland, 373 U.S. 83 (1963), counsel likely had no practical means to learn the answer prior to trial.

To be sure, counsel could simply have asked Garcia during cross-examination.  One of the Ten Commandments of cross-examination, however, is never to ask a question to which the answer is unknown.  See Irving Younger, The Art of Cross-Examination 23 (Am. Bar Assoc. Section of Litigation 1976).  Here, for example, the jury might have learned in response to the question that Garcia had been wounded while engaging in a drug deal.  While this hypothetical is hardly the only conceivable answer, it demonstrates why counsel wisely chose not to delve into this potentially dangerous terrain at trial.  Adams' speculation that the inquiry might have provided ammunition for

the defense is not enough to overcome the presumption that counsel's trial strategy was sound.

### b.   Breach of Confidential Source Agreement

Adams also faults his counsel for failing to question Garcia about having breached his CS agreement with the DEA by engaging in entrapment and not having sought to introduce that agreement into evidence.  (Pet. at 5a).  This assignment of error fails for at least two reasons.  First, Carathers' counsel, who was the first to cross-examine Garcia, expressly explored that subject.  (Tr. 258).  There consequently was no reason for Adams' counsel to repeat the inquiry.  See Eze v. Senkowski, 321 F.3d 110, 126 (2d Cr. 2003) ("[C]ounsel may have wisely decided not to repeat a line of questioning that had been pursued, or would be pursued, by [codefendants'] counsel."); Nersesian, 824 F.2d at 1321 ("Counsel might very well have felt that there was little need for additional probing by the time it was his turn to cross-examine, or even that cross-examination at that point might have been counterproductive.").  Furthermore, Adams' counsel may well have made a strategic decision that it would have been harmful to introduce into evidence a document created by the DEA which Garcia believed prohibited him from engaging in entrapment – Adams' sole defense – and which likely contained language harmful to the defense.  (See Tr. 258).

### c.   Perjury

Adams also attaches as an exhibit to his Reply a letter from his appellate counsel, dated July 29, 2007, stating that the Government had recently disclosed that "Garcia committed perjury during [Adams'] first trial" by testifying falsely that "he had

21

paid taxes on the income he earned as a [CS]."  (Reply Ex. 4).  Adams contends that had

his trial counsel properly investigated Garcia, he would have learned the truth and could

have used it to impeach Garcia's credibility.  (Pet. at 5b).  Here again, however, the

limited discovery that a federal criminal defendant receives before trial makes it highly

unlikely that trial counsel could have learned of Garcia's failure to pay his taxes prior to

trial, no matter how diligently he investigated Garcia's background.  Furthermore there is

no indication that the prosecutor was aware of Garcia's failure to pay his taxes, and hence

had a <u>Brady</u> obligation to disclose that information, prior to the completion of Adams'

second trial.  Defense counsel's failure to examine with respect to this subject

consequently does not constitute a departure from acceptable practice since an attorney

has an obligation to provide competent representation – not to be clairvoyant.

> d.   <u>Other Bases for Impeachment</u>

Adams also claims that his counsel failed to use available "3500" material

to impeach Garcia, (Pet. at 5a), but does not specify the nature of that material or how it

might have benefitted his defense or changed the outcome of the trial.  He further

contends that his attorney should have cross-examined Garcia concerning additional

phones Garcia may have used while inducing Adams to sell him drugs.  (<u>Id.</u> at 5a-5b).

Adams' counsel, however, did explore this issue on cross-examination.  (<u>See</u> Tr. 293-

94).[8]

---

[8]    Adams correctly notes that his attorney failed to introduce into evidence during
the second trial his personal cell phone, which contained an entry for "Steve, [Bourne's] cousin."
(S. 70).  In that regard, it is undisputed that "Bourne" was Carathers' nickname.  (Tr. 176, 376).
The cell phone entry was brought to the jury's attention during the first trial after Garcia testified
> (continued...)

4.      Failure to Object to Improper Jury Instructions

Adams next claims that his trial counsel was ineffective because he failed to raise constitutional concerns arising out of two erroneous jury instructions.  (Pet. at 5b, 10).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  United States v. Walsh, 194 F.3d 37, 52 (2d Cir. 1999).  When a habeas petitioner challenges such an instruction, "the only question for [the court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional] right") (internal quotation marks omitted).  In making this determination, an instruction "must be evaluated not in isolation but in the context of the entire charge."  Jones v. United States, 527 U.S. 373, 391 (1999) (collecting cases).

The first allegedly objectionable instruction was that the jury "may not consider [evidence of Carathers' prior narcotics sales] as to Mr. Adams in any way."  (Tr. 629 (emphasis added); Pet. at 5b).  Adams contends that the use of the words "may

_____

[8](...continued)
that he had never identified himself as Bourne's cousin.  (Cr. ECF No. 56 at 369, 526-29). During the second trial, Adams testified that Garcia had referred to himself as Carathers' cousin. (Tr. 497).  Furthermore, Carathers testified that he had described Garcia to Adams as his cousin. (Id. at 390).  Since Garcia was silent on this subject, the cell phone entry would simply have served to bolster Adams' and Carathers' uncontradicted testimony.  It therefore would have been cumulative evidence.

not," rather than "shall not," gave the jury the option to consider that evidence in

determining Adams' guilt.  (Pet. at 5b)  In context, however, it seems clear that "may

not," means "must not;" indeed, this phrasing is part of a standard instruction approved by

the Second Circuit.  See, e.g., United States v. Cadet, 664 F.3d 27, 33 (2d Cir. 2011)

(repeating, with approval, the district court's limiting instruction that "[e]vidence of

similar acts may not be considered by you for any other purpose").

   Second, Adams objects to the Court's instruction that, "[i]f the Government

succeeds in [proving each essential element of a charge beyond a reasonable doubt], your

verdict as to that defendant on that charge <u>should</u> be guilty; if it fails, your verdict as to

that defendant on that charge <u>should</u> be not guilty."  (Tr. 631-32 (emphasis added); Pet. at

5b, 10).  Adams argues that the use of the word "should" – rather than "shall" or "must" –

afforded the jury the option of convicting him on a lesser burden of proof.  (Pet. at 5b,

10).

   Here again, the Second Circuit has previously rejected this claim, albeit, in

an unpublished decision.  In <u>United States v. Castillo</u>, 122 F.3d 1057, No. 96-1518, 1997

WL 561133 (2d Cir. Sept. 4, 1997), the district court charged the jury that, "[i]f you have

a reasonable doubt as to the guilt of the defendant, you should not hesitate for any reason

to acquit."  <u>Id.</u> at 1.  On appeal, the defendant argued that "the use of the word 'should'

suggested" that the jury could convict him on the basis of proof that did not meet the

requisite standard.  <u>Id.</u>  The Court of Appeals disagreed, finding that "[t]he court's overall

charge amply instructed that the jury was required to acquit if the Government had not

proven its case beyond a reasonable doubt."  <u>Id.</u>  In reaching this determination, the Court

noted that the district judge's instructions "repeatedly specified the elements that the Government 'must prove beyond a reasonable doubt'" in order to convict, and that, "[i]n light of the instructions as a whole," there was "no likelihood the jury understood the . . . language as permitting it, if any juror had a reasonable doubt, to convict." Id.

Similarly, here, in the course of instructing the jury, Your Honor stated several times that the jury must find Adams not guilty if the Government failed to prove each element of the charge beyond a reasonable doubt. (See, e.g., Tr. 616 ("To prevail on a given charge . . . , the Government must prove each essential element of that charge . . . beyond a reasonable doubt"), 617 ("if . . . you have a reasonable doubt as to a defendant's guilt . . . , it is your duty to find the defendant not guilty"), 628 ("if the Government fails to [prove beyond a reasonable doubt that the defendant was predisposed to committing the crime], then you must acquit that defendant of that charge"), 631 ("the Government, to prevail on a given charge . . . , must prove each essential element of that charge . . . beyond a reasonable doubt")). When the instructions are viewed as a whole, it is clear that no reasonable juror could have believed that Adams could be found guilty if the Government failed to satisfy its burden of proof.

In sum, because both jury instructions were proper, Adams' trial counsel had no basis on which to object, and his representation thus did not fall below an objective standard of reasonableness.

### 5.   Failure to Object to Improper Summation

Adams also contends that trial counsel improperly failed to object when the prosecutor engaged in misconduct during his summation by: (a) conceding the first

element of Adams' entrapment defense; (b) referring to Adams repeatedly as a "liar;" and (c) vouching for Garcia's credibility.  (Pet. at 5b, 5c, 6; Reply at 16-17).

A claim of prosecutorial misconduct during summation requires a court to consider "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly, 416 U.S. at 643).  The issue is not simply whether the prosecutor's comments were "undesirable or even universally condemned."  Id. Accordingly, a mere showing of prosecutorial misconduct does not necessarily entitle a petitioner to habeas relief.  Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).  Instead, the petitioner must show that he "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict."  Id.  Thus, "a defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial."  United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted).

a.    Conceding The First Element of Entrapment

Adams' first prosecutorial misconduct claim, liberally construed, appears to be that the prosecutor should not have been permitted to concede that the Government initiated the drug transactions because it had failed to do so during his first trial.  (Pet. at 6-6a).  Adams argues that the Government's revised strategy "neutralized an essential element of the movant's affirmative defense," thereby somehow violating his Fifth and Sixth Amendment rights.  (Id. at 6).

26

"Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the Government's inducement to commit the crime." United States v. Brand, 467 F.3d 179, 189 (2d Cir. 2006) (quoting United States v. Williams, 23 F.3d 629, 635 (2d Cir. 1994)).  "If a defendant presents credible evidence of Government inducement, then the prosecutor must show predisposition beyond a reasonable doubt."  United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000) (citing United States v. Salerno, 66 F.3d 544, 547 (2d Cir. 1995)).  It was, of course, the Government's prerogative to concede the inducement element of Adams' entrapment defense.  See, e.g., Jacobson v. United States, 503 U.S. 540, 549 n.2 (1992); Salerno, 66 F.3d at 547. Although the prosecutor chose to do so for the first time during his summation, (Tr. 551; see Tr. 563), this development was, in fact, favorable for the defense.  Accordingly, as Your Honor noted on the record, the concession was "immaterial and [could not] possibly impact anything in this case."  (Tr. 563-66).  It follows that there was no reason for Adams' trial counsel to object.

        b.        Referring to Adams as a "Liar" During Summation

Adams also contends that the prosecutor engaged in misconduct by calling him a "liar" numerous times during the Government's summation.  It would, of course, be virtually impossible to deliver an effective closing argument in most cases in which the defendant has testified if the prosecutor could not suggest that the defendant's version of events was not credible.  Nevertheless, the Second Circuit has in the past criticized federal prosecutors for overuse of the word "lie."  See, e.g., United States v. Bagaric, 706 F.2d 42, 58 & n.14 (2d Cir. 1983), abrogated on other grounds by Nat'l Org. For Women

27

v. Scheidler, 510 U.S. 249 (1994).  Subsequently, however, that court has retreated

somewhat, observing that "it is not ordinarily improper for the prosecution to make

temperate use of forms of the word 'lie' to highlight evidence directly conflicting with the

defense's testimony, or 'to characterize disputed testimony' where credibility was clearly

an issue."  United States v. Shareef, 190 F.3d 71, 79 (2d Cir. 1999) (quoting United States

v. Peterson, 808 F.2d 969, 977 (2d Cir. 1987)).  As the Court further noted in Shareef, use

of the word "liar" or "lie" is particularly unobjectionable when "the prosecutor tie[s] to

the pertinent evidence of record each instance in which the defendant supposedly 'lied.'"

Id. (internal quotations omitted).

   Here, the prosecutor used the words "lie" or "liar" numerous times during

the course of his initial summation, but did so only a handful of times when describing

Adams' testimony.  Moreover, in each instance, the prosecutor made use of such terms in

the context of discussing the evidence.  For example, after the prosecutor suggested that

the defendants' entrapment defense was "a story," and that they had "lied in [the jurors']

faces," (Tr. 556), he carefully described the evidence that contradicted the defendants'

testimony, including Garcia's own testimony and the audio recordings reflecting Adams'

sophisticated knowledge about drugs and their cost.  (Id. at 555, 557-59).  Thus, by

suggesting that Adams must have lied because his testimony was inconsistent with the

credible evidence, the prosecutor did no more than Shareef allows.  See Shareef, 190 F.3d

at 79.  While it probably would have been better for the prosecutor to use different

terminology, the lack of any real prejudice is perhaps best demonstrated by the fact that

neither defense counsel raised any objection to this aspect of the prosecutor's summation.

See <u>United States v. Canniff</u>, 521 F.2d 565, 572 (2d Cir. 1975) ("The failure to object not only precludes our consideration of [the allegedly improper statements] on appeal, but indicates counsel's own difficulty in finding any prejudice.") (internal citations omitted).

c. <u>Vouching for Garcia's Credibility</u>

"It is well established that prosecutors may not 'vouch for their witnesses' truthfulness.'" <u>United States v. Carr</u>, 424 F.3d 213, 227 (2d Cir. 2005) (quoting <u>United States v. Modica</u>, 663 F.2d 1173, 1179 (2d Cir. 1981)). A prosecutor engages in such improper vouching when he "suggest[s] to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility." <u>United States v. Newton</u>, 369 F.3d 659, 681 (2d Cir. 2004). The vice of vouching is that it "may induce the jury to trust the Government's judgment rather than its own view of the evidence." <u>Id.</u> (quoting <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985)).

Here, in his reply papers, Adams contends that the prosecutor improperly vouched for Garcia's credibility, but he cites no instances during either the prosecutor's opening or his rebuttal summation. (<u>See</u> Reply at 16-18). In any event, even if the Court were to assume that some of the prosecutor's remarks constituted vouching, as the Supreme Court has noted, "[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand." <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150, 243 (1940) (quoting <u>Dunlop v. United States</u>, 165 U.S. 486, 498 (1897)). A fair reading of the trial transcript in this case shows that the prosecutor plainly did not intentionally overstep the bounds of permissible argument. Moreover, before the prosecutor began his summation, Your Honor expressly cautioned

29

the jury that "nothing that counsel says is itself evidence."  (Tr. 546).  In these

circumstances, Adams plainly cannot show, as he must, that any of the prosecutor's

remarks so infected the fairness of the trial as to deny him due process.  See Darden, 477

U.S. at 181.

        6.     Alleged Conflict

      Adams further maintains that his trial counsel had a "serious" conflict that

he improperly failed to raise with the Court.  (Pet. at 9).  At a minimum, he contends, this

should entitle him to an evidentiary hearing concerning the impact the alleged conflict

had on his case.  (Reply at 23-24).

        According to Adams, the conflict arose after the Government released to his

attorney certain "recorded conversations between [Adams and his family], in which

derogatory statements were made about [his] attorney, along with discussions regarding

[Adams'] defense."  (Reply Ex. 1, ¶ 6).  Adams contends that after he heard these

comments, defense counsel informed Adams and his family that "he could no longer

effectively represent" him, because of the "degree of disrespect and ill-appreciation which

had mutually developed."  (Id.).  Adams further alleges that when he said he could not

afford to retain counsel, his court-appointed attorney told him "that [he would] have to

live with what [he] get[s]."  (Id.).  In support of this claim, Adams has attached to his

Reply the unsigned and unsworn "affidavit" of his "fiancé" [sic], who states that the

recordings at issue were recordings of "Jail House" telephone conversations.[9]  (Id. Ex. 5).

---

      [9]     The fiancée's unsigned and unsworn "affidavit" is, of course, inadmissible.  See
Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007) (for a statement to "quality as

                                                                      (continued...)

It appears that Adams is alleging that his trial counsel was suffering under an actual, rather than a potential, conflict of interest. "An actual conflict occurs 'when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'" United States v. John Doe No. 1, 272 F.3d 116, 126 (2d Cir. 2001) (quoting Armienti v. United States, 234 F.3d 820, 824 (2d Cir. 2000)). Such a conflict "violate[s] the Sixth Amendment when counsel's representation of the client is 'adversely affect[ed]' by the existence of the conflict." Ventry v. United States, 539 F.3d 102, 111 (2d Cir. 2008) (quoting United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004)).

It is, of course, the rare criminal case in which a defendant and his counsel view matters of trial strategy entirely harmoniously. In this case, it seems likely that Adams expressed his dissatisfaction with his assigned counsel's performance in strong terms prior to trial, and that counsel responded in kind by urging Adams to retain another attorney if he could. This alone, however, plainly would not have been a basis for the appointment of another CJA attorney to represent Adams at trial. See United States v. White, 174 F.3d 290, 296 (2d Cir. 1999) (defendant cannot create a conflict of interest "simply by expressing dissatisfaction with his attorney's performance at trial"); Felder v. Goord, 564 F. Supp. 2d 201, 220 (S.D.N.Y. 2008) (quoting United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972)) ("Substitution of assigned counsel during trial requires the

_____

[9](...continued)
competent evidence for habeas review, it would need to be in sworn affidavit form, subject to penalty for perjury."). It nevertheless helps explain how the Government acquired tape recordings of Adams' post-arrest statements which came to be in defense counsel's possession.

defendant to 'show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.'").

Moreover, even if the degree of antipathy between Adams and his counsel rose to the level of an "actual conflict," Adams still would not be entitled to any relief, unless he were able to show that the conflict adversely affected his counsel's performance.  See LoCascio v. United States, 395 F.3d 51, 56 (2d Cir. 2005).  Here, there has been no such showing.  Quite to the contrary, during Adams' trial, his counsel mounted a vigorous defense relying upon a claim of entrapment, virtually the only available theory of defense.  Some measure of counsel's skill is the fact that the first trial, which entailed proof substantially the same as that proffered during the second trial, ended with the jury being unable to reach a unanimous verdict as to Adams.  At the second trial, as he had at the first, Adams' counsel vigorously cross-examined both of the Government's witnesses.  The transcript of Adams' testimony also confirms that Adams was carefully prepared by his attorney for his pivotal role in his own defense.  Finally, Adams' counsel presented a forceful summation in which he, too, did not mince words, telling the jury, among other things, that lying was "second nature" to Garcia, who was "good at deception."  (Tr. 592).  Although the entrapment defense ultimately proved unsuccessful, Your Honor noted while the jury was deliberating that Adams' counsel and Carathers' counsel were so skilled that you "wouldn't have minded even a third trial" with them.  (Tr. 670).  Later, at the sentencing, Your Honor reiterated for Adams' benefit that his counsel was "an extremely, extremely good lawyer" and that Adams was "really

very lucky to have him." (S. 169). Given this record, Adams cannot possibly show that his counsel's performance was "adversely affected." He therefore is not entitled to any relief even if his counsel was laboring under an "actual conflict" as he alleges.

7.    Ineffective Assistance of Counsel at Sentencing

Continuing his scorched earth attack, Adams also takes issue with his trial counsel's performance at sentencing. Specifically, Adams argues that his counsel should have contended that, even though Adams may have been predisposed to sell powder cocaine, he was entrapped to sell crack. (Pet. at 8-8a). Adams thus argues that the Government engaged in either sentencing manipulation, or sentencing entrapment by convincing him to sell crack, rather than cocaine. (Id. at 8a).

"Sentencing manipulation has been described as occurring when the Government engages in improper conduct that has the effect of increasing the defendant's sentence." United States v. Gomez, 103 F.3d 249, 256 (2d Cir. 1997) (internal citations and quotation marks omitted). "Sentencing entrapment is a related concept that 'normally requires that a defendant convince the fact-finder that Government agents convinced her to commit an offense that she was not otherwise disposed to commit.'" United States v. Deacon, 413 Fed. Appx. 347, 351 (2d Cir. 2011) (quoting United States v. Caban, 173 F.3d 89, 93 n.1 (2d Cir. 1999)). It is unclear whether either doctrine is recognized in this Circuit. See United States v. Gagliardi, 506 F.3d 140, 148 (2d Cir. 2007); Caban, 173 F.3d at 93 n.1. Even if these doctrines were to be recognized, however, to prevail on either theory Adams would have to show that the Government engaged in "outrageous

official conduct" that overcame his will.  United States v. Knecht, 55 F.3d 54, 57 (2d Cir.

1995).

       It is undisputed that Garcia's purchases of narcotics from Adams and his

co-defendant arose out of a DEA investigation of "violent narcotics traffickers" operating

in the vicinity of the Patterson housing project in the Bronx.  (Tr. 29-30, 32).  As part of

that investigation, Garcia was instructed to purchase crack cocaine from Adams.

Although Adams brought only powder cocaine to their first meeting, there certainly was

nothing outrageous about Garcia's request to engage in a second transaction in order to

secure crack, the substance he originally had requested.  Indeed, if Adams' argument that

this constituted improper conduct were to be accepted, DEA agents and informants would

often be unable to make multiple purchases of drugs from dealers for fear that this might

increase the dealers' sentences.  Suffice it to say, there is no case law suggesting that the

purchase of multiple drugs or quantities of drugs is improper, much less outrageous.

Adams' sentencing manipulation claim consequently is baseless.

       Adams' sentencing entrapment theory is equally meritless.  In its decision

rejecting Adams' claim, the Second Circuit expressly held that a properly-instructed jury

had been presented with evidence from which it "could reasonably conclude that Adams

was perfectly willing to avail himself of the Government-initiated opportunity to sell both

cocaine and crack."  Carathers, 280 Fed. Appx. at 74 (emphasis added).  Having failed to

convince either the trial jury or the Second Circuit that it was error not to have found that

he was entrapped, Adams plainly cannot seek to have his conviction set aside on that

basis on collateral review.  See United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001)

(quoting <u>Cabrera v. United States</u>, 972 F.2d 23, 25 (2d Cir. 1992)) ("'It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal.'").

Moreover, because the jury concluded that Adams was not entrapped, and because the Court of Appeals agreed that this finding was reasonable, Adams' trial attorney can scarcely be faulted for failing to present Adams' entrapment defense to Your Honor when Adams appeared for sentencing.

8.     <u>Ineffective Assistance of Appellate Counsel</u>

Finally, Adams contends that a different attorney appointed to prosecute his appeal also was ineffective.  Many of his assignments of error regarding that attorney relate to the failure to raise an ineffectiveness of trial counsel claim on appeal.  As noted previously, however, none of Adams' attacks on his trial attorney is meritorious.  It follows that Adams' appellate counsel could not have been ineffective simply because she declined to raise these same claims as part of his direct appeal.  <u>See</u> <u>Feliciano v. United States</u>, No. 01 Civ. 9398 (PKL), 2004 WL 1781005, at *8 (S.D.N.Y. Aug. 10, 2004) (since "petitioner's ineffective assistance [of trial counsel] claim is without merit, counsel's decision not to pursue the claim on appeal was certainly not an omission of a significant issue"); <u>Smalls v. McGinnis</u>, No. 04 Civ. 0301 (AJP), 2004 WL 1774578, at *32 (S.D.N.Y. Aug. 10, 2004) (appellate counsel not ineffective for failing to allege that trial counsel was ineffective, where there was no basis for the claim).

IV.    Conclusion

For the foregoing reasons, the Court should deny Adams' Petition.
Additionally, a certificate of appealability should not issue because Adams has failed to
make the substantial showing of the denial of a constitutional right required by 28 U.S.C.
§ 2253(c)(2).

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this
Report and Recommendation, they must, within fourteen days from today, make them in
writing, file them with the Clerk of the Court, and send copies to the chambers of the
Honorable Jed S. Rakoff, United States District Judge, and to the chambers of the
undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007,
and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).
Any requests for an extension of time for filing objections must be directed to Judge
Rakoff. Any failure to file timely objections will result in a waiver of those objections for
purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);
Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:    New York, New York
          March 4, 2013

                                   /FRANK MAAS
                              United States Magistrate Judge

36

Copies to:

Honorable Jed S. Rakoff
United States District Judge

Darryl Adams
# 70007-054
United States Penitentiary
Post Office Box 3000
Pine Knot, Kentucky 42635

Jeffrey Alan Brown
Assistant United States Attorney
Office of the United States Attorney
One St. Andrew's Plaza
New York, New York 10007